Our first case this morning is Blow v. Bijora, Inc. May it please the Court. Good morning, Your Honors. My name is Dana Priminis, and I represent the appellant, Nicole Blow, in this matter. If I may reserve five minutes for rebuttal. Thank you. The TCPA, or the Telephone Consumer Protection Act, was enacted in 1991 to protect consumer privacy rights and public safety. Congress made it illegal to use an automatic telephone dialing system, or an ATDS, or oftentimes referred to as an autodialer, to call consumers on their cellular telephones without their prior express consent. In drafting the TCPA, Congress chose the language carefully to target the proliferation of intrusive calls and nuisance calls.  In 1991, both Congress and the FCC, the commission charged with interpreting and implementing the rules of the TCPA, they knew there would be advances in calling technology, so the language was drafted carefully. Specifically, the FCC used the unqualified use of the term capacity. They used this on purpose. This was intended to prevent circumvention of the prohibition on making autodial calls to cell phones. That is the issue that we have here today before the court. What we are dealing with is not a smartphone. This is not an iPhone that had a potential to download an app so that you can call and harass your family and friends. That's not what we're dealing with. What we're dealing with here was an Internet-to-phone web-based text messaging platform. Ms. Terminus, excuse me, please. Sure, Judge. How important is the district court's conclusion that human involvement was required at nearly every step in OPT-IT's process for sending texts? Is the automation of the final step of sending out the message simultaneously to hundreds of individuals sufficient to demonstrate that OPT-IT's platform is an autodialer? Yes, Your Honor. I believe that the district court erred in that respect. Human intervention is important, but not the main focus when we're dealing with a system like that. The automated functions of this system are very important. Because, again, if you look to the legislative intent behind the TCPA, what were they trying to prohibit? They were trying to prohibit conduct such as this. Because the district court focused on elements of human intervention here, so they focused on the way that the numbers are input into the system. There will always be human intervention at some point. Isn't the problem really for us to figure out what Congress meant by no human intervention? Isn't that the problem? Well, Judge, Congress did not mention human intervention. FCC, I guess. FCC did. Correct. Correct. It is important, and I think that's important to consider as well, going back, again, to the legislative intent. In 1991, Congress knew at the time that the systems that were being used, there was always a human involved. A human wrote the code for those systems. A human wrote the algorithms so that those systems can randomly and sequentially generate numbers. A human will always be involved. A human determined those. I'm talking about the systems back in 1991 at this point. A human is going to determine what is going to happen when a call connects. The human made that decision. Prerecorded voices. The human determined what that language should say and that message will connect to all the calls that the predicted dialer or the auto dialer connects to. In this case, when we're talking about human intervention, the district court focused on the fact that, as I was saying, that a call list was uploaded by a human. What we're talking about here generally is a large Excel spreadsheet that contained, in some cases, thousands of phone numbers. That was uploaded. That spreadsheet had been put together through voluntary contributions of individuals. According to Bajor, that's a fact that has been disputed by appellant all along. That goes to the issues of consent. That isn't necessarily involved in appellant's appeal here. But, yes, the way that they obtained the phone numbers was a disputed issue. It wasn't a random selection of phone numbers. It wasn't a random selection of phone numbers, but that is not what is required under the TCPA per the FCC. How do we know that? The FCC has been explicit regarding call lists. They have determined, I believe it was first stated in the 2003 order. It can be the 2008, correct me if I'm wrong, or I can come back to this on rebuttal if need be. But the court specifically stated, because of the technological advances, it made more business sense to use lists moving forward. So the 000, 0001, 0002, that process didn't really make business sense anymore, but to have lists that were uploaded into systems to call those, that made more business sense. So you didn't, the system didn't need to. You make much of the platform's ability to store numbers from a defined list, but the fact that the list itself is manually created using numbers given to Acura employees means that these numbers themselves are neither random nor sequential, does it not? Well, they were manually included, they were manually at some point included in a list, but then that list existed. That list was then uploaded electronically into the system where it was stored. The issue with the sequential, sequential, I know that the third district in the Yahoo case rejected the argument  sequential. I've heard FCC arguments to the contrary, saying that calling numbers in a certain order from a list can be determined, can be defined as sequentially calling. Sorry, Judge. Is your client, oh, I'm sorry, Judge Rovner, are you still questioning? Well, I'm wondering if they provided evidence that it was not Lowe that Well, that's another issue in dispute, Your Honor. The plaintiff or appellant has always taken the position that she did not consent to receive the text messages. Relative to the issue of consent, she had provided her contact information to Bajora, to the Acura clothing store, to receive certain information about two specific pairs of shoes. That was noted on the cards that are discussed in the record. The other issue relative to the allegation that she opted in to receive the text, her position has always been throughout the case and is consistent in the record that she only provided her contact information to receive discounts. And I think it's very important to look at the date upon which that opt-in text occurred. Bajora does not reference the fact that she was receiving texts before that time. So that's why the consent is a huge issue here. She was receiving text messages prior to signing the form? No. There isn't a set date for that. The position was that she started receiving the text after she provided her contact information to Bajora. Well, is there any evidence in the record that she ever followed the procedures to unsubscribe from Acura's text list simply by texting Acura Stop in response to the unwanted texts? Your Honor, no, she did not. But that is not a requirement to maintain a claim under the TCPA. It is not something that she was required to do. She was of the mindset that she would get these messages. She was highly annoyed. She would get a lot. She got 60 messages in total. As soon as she would get it, she would delete it. Another important point that is in the record is that all of the messages sent by Bajora did not include opt-out language. She didn't think she was going to get messages when she consented to get messages? Your Honor, she did not consent. But she signed the card, didn't she? She filled out one of the cards herself. But the back of the card evidences the scope for which she provided any form of consent. Courts in this circuit are clear. Courts in the Northern District of Illinois have consistently held that the scope or the consent that is provided is limited to the scope for which it is provided. The cards that Bajora relies upon to prove consent in this case, not only for appellant but for many of the other members of the class in this case, show that they specifically provided their contact information to receive information regarding certain products. The appellant in this case wanted information about a certain pair of shoes. That information was noted on the back of the card. Group Exhibit A to plaintiff at the time, Appellant's Motion for Summary Judgment, is Docket Entry 327. But she filled out more than one card, didn't she? She did not. There was an affidavit, again, attached to Docket Entry 327 with her Motion for Summary Judgment. She did not fill out that other card. An ACURA employee filled it out on her behalf. And there's another distinction there. Wait a minute. On her behalf? Correct. Correct. The president of ACURA in his deposition testified that there were times where employees would fill out cards on behalf of the customers. So they would, for example, you're standing at the register and they're checking you out. Can I have your contact information? They would fill it out. Or the way that their customer service sales or their sales associates would work, they work as closer to a personal shopper. They want to know what you're doing. Why are you buying the clothing that you're here for today? They take note of this on the card. That second card that Bajora relies upon to prove consent, Ms. Blow attested in an affidavit attached to her Motion for Summary Judgment that she did not fill out that card. Does that card have her telephone number on it? It does. She must have given it to her? She must have given it to them, correct. But, again, the back of that card, again, limits the scope of consent to a certain item in the store. I'm sorry, Your Honor. Could you repeat that, that it limits the item? It limits? What's the limitation? There was, again, she provided the contact information on the card that she states she did not fill out. She stated, again, that on the back of that card it states that she was looking to purchase a certain pair of shoes and she was requesting a callback when the shoes would come in. She testified to the same effect. That she was waiting for them to come in her size and when they were to come in the size, they were to call her regarding those specific pair of shoes. Not once did they discuss a texting program with her. Not once did they tell her they were going to send mass marketing text messages regarding fashion shows, men's sales, and different events. She wanted to know about a specific pair of shoes. As I stated before, this is a common question to the entire class, the issue of consent regarding these cards. Bajor also expressed, it states in the briefing in the appeal and also in the district court record, that these cards somehow obtain consent. They focus on one of those cards, which is an Acura VIP card. That card, underneath the telephone line I believe it is, has language regarding receipt of text messages. The problem here, there were over 20,000 pages of cards produced in Discovery. Only one version of those cards included that consent language. There were several versions. If you look at the record, the first card, the card that appellant actually filled out herself, did not contain that language. That's the Acura client card. There was nothing written on that card regarding text messages. Nothing at all. That's the same for many of the class members. I'm talking thousands of cards here. Only one version. How did she think they were going to contact her? A phone call. By telephone? A phone call. Excuse me? A phone call? A phone call regarding a specific pair of shoes. Correct, Your Honor. Correct. The cards, as I said, Eric Hsu, the president of Acura, in his deposition, testified that the cards that were being used in the stores, they didn't know which cards were being used where. They didn't know which cards were being used when. So the different versions of the cards were being used at all of the stores at any point in time, before litigation and during litigation for a certain point in time. So to state that these cards obtained the express written consent that the TCPA requires, it's nonsensical because those cards did not obtain those consent, especially considering the scope argument that is applicable in the circuit. I'd like to go on to something else because in your complaint, you sought treble damages or $1,500 for each text that was sent. What evidence did you produce that Acura willfully or knowingly violated the TCPA in a way that would entitle you to recover treble damages? A big piece of evidence in the case was produced by third-party Optit, Inc. Optit provided the text records associated with Acura's account. A portion of that account showed many examples from consumers stating and making attempts to opt out, but they unsuccessfully did so. There were many texts in the record that stated, this is not, I did not provide my phone number. Please do not contact me, for example. This is the third time I've attempted to opt out. Please remove me from this list. This list is on the do not call list. It is illegal to contact this number. There was plenty of text messages sent in response to Bajora's messages that they had in the Optit system, but people continue to receive these text messages. That is a big piece of evidence that showed that they were aware of this. They were aware. Can I switch the focus for a moment before your time runs out? Certainly. I'm concerned. I understand the FCC has now said that it's not only the current capacity of the equipment, but the future capacity of the equipment that counts. My question is twofold. First, what is the rationale behind that change? And secondly, how does this equipment qualify? What evidence did you submit to show that this equipment qualifies under that rule? The rationale, as I stated in the beginning here, is the TCPA's initial purpose, to protect consumers from being robo-dialed to their cell phones without their express written consent with an auto dialer. As I said before, the TCPA knew there would be advances in calling technology. For the FCC to determine that the capacity is not only the present capacity, but the future capacity. What does that have to do with whether these individuals are liable now? In other words, what could the machine do when they used it, as opposed to what that machine might be able to do if it got in the right hands sometime later? Did the FCC mean to interpret the statute so as to impose liability on people for a machine that didn't have the present capacity? Your Honor, I believe that they did. That's exactly what this machine did. This machine can dial 100 messages in one second. It can send 100 messages in one second. You're talking about present or future capacity? Present. That's what they did. I'm talking about why you don't. Your argument in the brief, as I understand it, is because the machine, even if the machine did not have the present capacity to break the law, the fact that it could be changed to have that capacity would make these people liable. That I don't understand. Your Honor, that's not the only argument. That is an alternative. I know, but that's the argument I need an answer to. Sure. That's an argument and an alternative. Because we believe that the system did have the present capacity. I understand that, but I need an answer to the other question. If you can clarify, I'm sorry. Your alternate argument is that if the machine could be changed so that it would have in the future the capacity to violate the law, that is sufficient to hold these people liable for using it now, even though the machine did not have that capacity now. Yes. As I say, I don't understand the rationale for that. The FCC has explicitly stated that that's what happened, that that is what is to occur. It is not just the present capacity. It's the potential functionalities. The affidavit that the district court relied upon regarding the system and the need for a software modification, the FCC specifically dealt with that specific issue in saying that, by finding that even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodealer. That's what we're talking about here, requisite capacity. The capacity of the ATDS is not limited to its current configuration but the potential functionalities. Then we get to the second part of my question. What are we talking about here? What evidence do you have that, in fact, this machine could be altered to have a different functionality that would create this problem? The affidavit that the court relied upon to deny summary judgment actually supports the contention put forth by the FCC. The Brian Stafford affidavit states that modification to the software platform can bring the system within the current configuration. This is the CEO's affidavit? Correct. If I'm not mistaken, he said it would have to be substantial change or take 90 days to do it, right? Potentially. That was his opinion in his affidavit. What other evidence did you submit to counter that? This is another issue. Or to bolster your position. The position in the record regarding the system in general, its abilities and what it was able to do. But notwithstanding that, I believe that my time is up if I can respond. No, you have time. Okay. The issue with the affidavit. We were not able to put forth any additional evidence regarding that issue at that point in time because of the first issue in plaintiff's appeal regarding the withdrawal of the admission regarding the ATDS. That's a bigger issue in the case, according to plaintiff, regarding the fact that they had previously admitted to it. That affidavit was provided in the middle of summary judgment. Brian Stafford was deposed. Your Honor? I have such difficulty with that argument of yours because Akira's response to your request for admission certainly seems to have been an obvious typographical error. And if you were prejudiced by the district court's decision to allow Akira to amend the response, why didn't you move to reopen discovery at that point? Your Honor, that's a good question. We were before the magistrate, and discovery had been extended on several occasions. The magistrate judge made it clear that the date that it had been extended to was a hard stop on discovery. Furthermore, at that point, we had already filed our motion for summary judgment. All of the evidence was already in the record. Furthermore, the purpose of an appeal while we're here today is to discuss an issue such as that. Going to the quick, I see that my time is up. Well, I'm going to give you five more minutes. Thank you, Your Honor. The issue with the inadvertent error I think is very important. The district court relied upon that. The biggest issue here is that that admission, the magistrate judge relied upon that admission and quoted it verbatim in the decision on class certification regarding numerosity under Rule 23. The district court adopted, Your Honor. Between the complaint and the request for admission and discovery, Ms. Blow sought on six occasions to have Akira admit that Optit sent text messages using an autodialer. Four of these requests for admission were identical, differing only in the stated number of individuals who had received text. And in the first three, Akira responded by stating, admit except unknown if Optit used an autodialer. In the fourth admission, Akira simply stated, admit without the express denial as to an autodialer. And that error came, Akira's error came to light only when Blow moved for summary judgment and sought to rely on the supposed admission that Optit used an autodialer. And of course, the district court properly, in my view, allowed Akira to amend its response to bring it in line with the preceding and otherwise absolutely identical responses. And the district court noted that you never moved or otherwise demonstrated how you were prejudiced by the court's decision. So ultimately, you can't place the blame on Akira for her, for Blow's failure to retain an expert or otherwise provide, you know, evidence. Very often judges say, look, this is the last time I will continue discovery, and then the judge continues discovery. You know, you should have asked and you didn't. Sure, that may be the case, Your Honor, but what Rule 36 requires or allows a party to rely upon an admission by a party opponent? They allow that. By allowing Akira to withdraw that admission at that stage in the game, so to say, that produced prejudice. That was an abuse of discretion and appellant's position. Akira filed, or Bajora, I'm sorry, filed objections to the magistrate's report that specifically referenced that admission to state they were only aware of it on summary judgment. That is a hard pill to swallow because they filed objections to a report that was adopted by the district court that quoted it verbatim. Would you have, what is your view, you've raised questions about the interpretation of the statute there, rather unique, especially your alternate argument on what the, on the future capacity of the machine. Why shouldn't we just invite the FCC to enter this case as an amicus, tell us what they mean by their regulation? I wouldn't have a problem with that, considering the FCC's position. I believe that appellant's position is consistent with the FCC, consistent with what the FCC has already determined to be an autodialer, especially specifically relative to the internet to text messaging platform. I believe that the position is consistent with the FCC's. They took no part in the district court litigation. Correct, correct. I believe that Bajora filed a petition, but it wasn't unrelated to the matters before us today. I understand. Thank you for the additional time, Your Honors. Case, please, the court. My name is Jim Borshe, I represent Bajora, which does business as Acura. This is a case about a business that was sued for nearly $2 billion for sending promotional text messages to its customers who agreed to receive them. There was discussion about consent in counsel's argument. I think it's important, what she said was written consent is required. That is absolutely not true. Under the TCPA, written consent is not required. And what she left out with these cards that were filled out was there was discussions with, before the cards were filled out, by Acura sales clerks that said, do you want to join our text program to get messages on discounts? And if the customer said no, it ended there. If the customer said yes, the customer would fill out the card, or we'd fill out the card with their consent. In this case, Nicole Blow consented undisputedly to receive these messages. Your Honors talked about the fact that there were two cards that were filled out for her. She gave us her cell phone number. We didn't get it, she gave it to us. Counsel said in her argument, she gave those for a pair of shoes, but also to receive information on discounts. These text messages contain information on discounts. And the coup de grace here is, on October 1st of 2009, Blow expressly consents by opting again into the program. She texted Acura to the code where she opted into the program. If you look at Counsel's brief, she admits that Blow did that. Blow opted in three ways, two cards and opting in. Now what happened after this? She got text after text after text. Did she ever complain? No. The text gave her express instructions, how you can opt out of this. Did she ever opt out? No. And she didn't file this lawsuit. Blow was solicited to come into this case after the original plaintiff was improperly filed the case, was basically disqualified from being the representative, and then Counsel sent out these mass solicitations of e-mails to the class to get Blow into the case. So there is no question here in this case that Blow consented to receive these text messages. And not just Blow, also the class. Counsel talked about it. We produced more than 20,000 cards of customers of ours who agreed to receive these messages. There is absolute consent here. The issue of the ATDS is a complicated one. There is no question. The case law on this is not very clear in terms of interpreting this. But we have to look at the statute. What does the statute say? The ATDS is a defined term by Congress in the statute, and it says the equipment has to have the capacity to store or produce telephone numbers to be used to either randomly or sequentially dial numbers. In this case. What if a text message is entered into OPT-IT's system and a time and date is set for it to be sent? Is any further human intervention required? In other words, does a human need to push a button at the time the texts are actually sent, or is composing the message and setting the time and date for sending the only human involvement that is required? Well, human involvement, Your Honor, is required here to get the numbers. In terms of OPT-IT didn't have the ability to sequentially or randomly get these numbers. So human involvement was involved in gathering the numbers. Human involvement was involved in putting those numbers into the system, either by the individual from Acura or OPT-IT, or by the customers by opting in, which blowed it here both ways. But your question is, how does it get sent? Well, there is human requirement to actually hit the button to say either send it now or the human can say send it later. That's no different than a speed dialer or a cell phone can do if you have a certain app. You can do the very same thing. So in any text message that's sent, there is some automation involved. But here we have extensive human involvement. We don't have the type of automation you would need here that Congress intended when they drafted this statute. Congress was concerned about auto dialers and sequential dialers. And somebody's in a hospital room and they're getting these automated calls to their phone. That's what Congress is worried about. They're not worried about situations here where you have a. . . What is the difference between a predictive dialer that uses automated equipment to dial numbers from a list and which the FCC has concluded is an auto dialer and the system that OPT-IT uses? What's the difference? So a predictive dialer, Your Honor, is where the system tries to predict based upon time of day, based upon the individuals of when those individuals will be home and when they'll be able to answer their phones. That's a predictive dialer. Here, OPT-IT did not have the capability. OPT-IT only had the ability to send the messages out in mass. And that's what happened here. But that's what speed dialers do. That's what cell phones can do. If you have a contact list, you can send text messages to your whole contact list. That doesn't make it an ATDS under the statute. So here, under the statute that Congress drafted that we have to interpret, this system is not an ATDS. It is not an auto dialer. It cannot randomly or sequentially produce or store numbers. Now, the issue here is, and actually I cite to the Millward-Brown and Jiffy Luke case that talks about the fact it has to be capacity. Now, we got into the issue of what's the FCC and potential. The district court applied the FCC's order. And here, we don't have any evidence in the record to suggest that the OPT-IT system could become an auto dialer, even actually or potentially. And the FCC has said theoretical possibilities are not enough. You have to have some concrete evidence that this system is or could be an auto dialer. We don't have that here. All we have is the system was not, is not, and as far as we know, cannot do the functions that Congress anticipated when it drafted the statute. Now, can you help us out on this question of exactly what the FCC is trying to do in the last order? Are they trying to hold individuals liable for using a machine that, while not presently configured to be a forbidden machine, could be changed to be a forbidden machine? I think the answer to that is the FCC said it can't be just theoretical. It has to be. There has to be some evidence of an actuality. And so that issue is before, actually, the D.C. Circuit right now. But we don't need to get there because, first of all, we have consent here. We don't need to get to that issue. But if you want to talk about this issue here is, in this case, the FCC would say this is theoretical. What the plaintiff is saying here is there could be some theoretical change. The same thing could be said about a cell phone. You could have a cell phone, a smartphone. You could put an app on and do these things. Now, I don't think we're saying here that Congress has outlawed cell phones or smartphones. And, really, if you take the plaintiff's argument, that's what they're saying. They're saying, well, you could turn this into an ATDS. That's not what Congress said. Congress said it has to have the capacity. It didn't say potential capacity. It didn't say could be. The statute says the capacity. This system did not have the capacity. It sounds like the FCC has put a pretty aggressive spin on those words. I think so, Your Honor. But, again, in this case, we don't need to get there. I'm worried about whether we need to get there and we might create some kind of a conflict with the D.C. Circuit. That's my concern. And I think if you look at the district court opinion, the district court did apply the FCC order and said in this case there was no evidence the plaintiff submitted to get us to the point of more than just theoretical possibilities here. So your view is the district court looked at as a failure-proof case? Yes. Well, the consent, your opposing counsel indicate that's not in the record or it doesn't exist. Are the consents? Oh, absolutely, they're in the record. And the district court didn't get to that issue. But if you look at Eric Sioux's affidavit, we have the two cards, the consent cards. Nowhere in those cards, Your Honor, counsel is saying there was this restriction. You won't see that in those cards. There is absolute consent here. And if there wasn't consent, why would she opt in? Why would she text her phone number to opt in unless she wanted these messages? Why would she take these messages all these years and not have one boo of a complaint? She keeps shopping at our stores, probably using the discounts we gave her, and now she wants to say, you know, seven years later, I didn't agree to this. That's not the way the law works. And there's no explanation at all for why she opted in. And why did she admit it? The card was filled out, one by her, one on her behalf, with her consent. Judge Norrell didn't address the consent. He didn't because he only got to the ATD issue. He didn't get to that issue, Your Honor. But the record evidence here is very clear. And this case has very disturbing aspects. I mean, the fact is, from the time this case started, Judge Rohnert, you asked the question, what evidence the plaintiff had to allege a willful violation. There was no evidence. This was not my client's system. My client did nothing wrong. And to allege that we willfully violated a statute, and in answer to your question, Judge Rohnert, counsel said, well, there was evidence produced by Opt-It. That evidence doesn't support a willful violation by my client. But regardless, they didn't have that information when they filed the lawsuit. That information came after the lawsuit was filed. And then we get a situation where their plaintiff from their firm is disqualified. And what do they do? They inappropriately and improperly send out a blast email. The only unconsented communication here is their blast email, where they say in the email, this is a class notice. The subject matter is class notice. This is record evidence number 336-6. Notice of pending class action. The court never approved this notice. In the notice, they say, our records reflect that you may have been receiving text messages without your consent from the retail store Acura. They had no evidence of that. In fact, they had evidence of the contrary. They had over 20,000 pages of consent cards showing these customers did consent. Then we have this individual, Mr. Nguyen, who we produced his affidavit. He's a class member. He said, you know what, I went to this store. I consented. Why would I get money for this? There was absolute consent, not just by Blow, but the entire class here. So then we get in a situation where Blow is solicited, and so is this woman named Glasson. There's a lawsuit filed for Blow and Glasson. Then it's turned out that Glasson didn't even get the text. So she's removed out. And then with respect to Blow, the evidence is clear. She is the poster child for our defense. She's got two consent cards. She opted in, and she never opted out or complained about this. Then you have a situation where they settled with Opt-It. After a class is certified, they settle with Opt-It. Rule 23 says after certification, if you settle or dismiss a defendant, it's got to be with court approval and class notice. Did they do that? No. They took Opt-It's money. Was Akira consulted at all when Messer settled her claims with Opt-It? I'm sorry, Your Honor? Was Akira consulted when Messer settled her claims with Opt-It? I apologize. Absolutely not. We were, in fact, shocked. I mean, we're the innocent party here. They brought out Opt-It's the one who came to us and said, we have this legal system to send out texts for you. They sue Opt-It, and then Opt-It files a motion to disqualify their firm, and what do they do? Three days later, they dismiss the class claims, and soon after, they dismiss Opt-It. Turns out later they settled with Opt-It. What do they do? They put the money in their pocket. Strickland puts the money in her pocket with the firm. The class is never notified. The judge is never given notice of this, and the judge never approves it. There's a class, and the class is a class as to the entire case. And counsel wants to say in her brief, well, it wasn't a class as to Opt-It. Opt-It's in the case. There's one case. There's a class certified. Rule 23 says there must be approval. There wasn't here. Then you get a situation where. . . Mr. Decker, you disclosed that Strickler worked at the firm. How did you discover that conflict of interest? We actually thought we saw it early on, Judge, because we had a little research done on her ourselves. It wasn't in the complaint. It wasn't in the motion for class certification. We did suspect early on that she was a part of the firm. We didn't know it for sure. The district judge denied our request for a discovery on the class certification motion, so we couldn't oppose her. But we suspected early on. But counsel didn't disclose it to the court, either in the certification motion or the complaint. Opt-It's the one, and we should have probably done it earlier, Opt-It's the one who brought it to the forefront by they moved to disqualify the Messer firm with the motion disqualified. So we did suspect early on, Judge. But my point on this is this should have been disclosed to the court. This was a duty of candor to the court. And if you look at Strickler's complaint, it's not in there. If you look at her motion for class certification reply, she submits an affidavit.  And what she says is she's an attorney. She doesn't say she works for the plaintiff's firm. And so this is improper conduct. And then you get in a situation here where they didn't disclose this, they get ready to be disqualified, and all of a sudden they take Opt-It's money and say, okay, we'll let you out of the case as long as, you know, your motion is now gone because we're going to settle with you. I mean, that's not the way things should work. That's not the way litigation should be conducted. And then after that, they go out and they send this last e-mail to the entire class saying, please come in as class representative. That's not proper. We decided the case law that says you shouldn't be soliciting class representatives to continue class actions. This case should have ended right there. It should have been filed in the first place. But it certainly should have ended right there, and it didn't. And my client was put through more than five years of litigation, my client who did nothing wrong. They want $2 billion, basically saying your company is out of business. We're going to put your company out of business. My client couldn't sleep at night because these people filed this frivolous lawsuit against my client. He did nothing wrong. The TCPA was never intended to stop legitimate business communications. My client did everything right. It took Opt-It's instructions, it went to its customers and said, if you want these messages, give us your number, we'll give them to you. And if they didn't want it, we didn't send them to them. Nothing was unsolicited here. And we sent only the messages to people who asked to receive them, including Nicole Blow. And what did we get for it? We got a $2 billion lawsuit. So this case, affirming the district court is not enough here. Sanctions are appropriate because what we've been put through is a grave injustice. And I want to just talk about class certification for a moment. We've also challenged the district court's ruling on that, on our cross appeal. And that is the district court certified a class, and you've heard some discussion here, a debate about Nicole Blow and whether she consented or didn't consent. And the issue here is that would have to be done for each class representative. Our point is, and the case law supports, if you have substantial evidence of consent in these cases, you can't have a class where you're going to have a debate. Nicole Blow, Sally Smith, Mikey. There has to be individual inquiries on consent. And the plaintiffs submitted no evidence they could prove this on a class-wide basis. Counsel talked about these cards that she says evidence some disturbance. How can she do that? How can Nicole Blow satisfy that? She can't. And the class representative has to satisfy the class member's claims. She can't, and she never could. And the last thing, Your Honor, I want to bring up is the issue of the court allowing us to amend. I think it's disingenuous for counsel to say that there was any reliance upon that answer. If you look at the specific, and Judge Rova, you raised this issue, but the question was admit you had more than 40, 100, 500 texts that were sent. And we said for each one of those, we said we admit the texts were sent, but we don't know if it was an auto dollar. We said it for 40, 100, and 500. For 1,000, we made a mistake and just put admit. But how could counsel really believe that that would have meant we admitted there was an auto dollar there when the fact was in the 40 to 50, 100 ones, we said we don't know. It wasn't our system. And in our answer to the complaint, we said we don't know this because it's not our system. It's opt-it's system. Five minutes included? Okay. I mean, he's using the five minutes. Okay. I'll just finish quickly. The issue, Judge, is that opt-it's, in our answer to the complaint, we were consistent. We don't know if it's an auto dollar. It's not our system. It's opt-it's system. And the fact is an insufficient knowledge answer is a denial. So we, counsel have said we've admitted this throughout the case. We didn't admit it. We say we didn't know. And when opt-it came forward with Mr. Stafford's affidavit and deposition, he testified unequivocally this is not an auto dollar. And he gave specific examples of that. And for counsel to say she relied upon the request for admission is wrong because she deposed Mr. Stafford and Mr. Lamb after our admission answer. So she obviously didn't rely upon that. She actually took their depositions. So she knew this was an opt-it's system, and she got the information from opt-it. I thank you for your time today. Thank you, counsel. Is there any additional time? Thank you. Thanks to both counsel. The case is taken under advisement.